[Cite as *State v. Smith*, 2013-Ohio-114.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
ROSS COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | Case No. 12CA3308 |
| | : | |
| Plaintiff-Appellee, | : | |
| | : | DECISION AND |
| v. | : | JUDGMENT ENTRY |
| | : | |
| CARLOS M. SMITH, | : | |
| | : | **RELEASED 01/11/13** |
| Defendant-Appellant. | : | |

_____

APPEARANCES:

Aaron M. McHenry, Chillicothe, Ohio, for appellant.

Matthew S. Schmidt, Ross County Prosecutor, and Jeffrey C. Marks, Ross County Assistant Prosecutor, for appellee.
_____

Harsha, J.

{¶1} After pleading no contest to complicity to possession of cocaine, Carlos Smith appeals the trial court's denial of his motion to suppress. During a traffic stop, he admitted that he and his passenger had been smoking marihuana and gave the trooper a small baggie of it. Aside from loose marihuana on Smith's t-shirt and in the vehicle's passenger compartment, the trooper found no other contraband on Smith or in the vehicle. However, during a pat down search the trooper detected a hard object, which he believed to be crack cocaine, between the passenger's buttocks. The trooper transported Smith and the passenger to a patrol post where the trooper searched both men again. The trooper found no contraband on Smith but seized crack cocaine from between the passenger's buttocks. When confronted with the trooper's discovery, Smith made incriminating statements.

{¶2} Smith contends that the statements he made after the trooper found the

crack cocaine should be suppressed because they were elicited during an unconstitutional detention. We disagree. At the time Smith made the statements, the trooper had a reasonable articulable suspicion that Smith was complicit in his passenger's possession of crack cocaine. Smith admitted that the pair engaged in one illegal drug activity together (smoking marihuana), and they gave inconsistent stories about their travels. Smith and the passenger claimed they were together their entire time in Ohio, so Smith would have witnessed any drug transactions the passenger conducted in the state. Smith also gave inconsistent stories about his lodging in Ohio and claimed he came to the state to buy clothes even though none were in the vehicle. Moreover, the trooper testified that it is common for criminals to give a suspicious officer a small bag of marihuana, like Smith did, to "appease" the officer, i.e., to mollify his suspicions and avoid discovery of a larger stash of drugs. Accordingly, we affirm the trial court's judgment.

## I. Facts

{¶3} The Ross County grand jury indicted Smith on one count of complicity to possession of cocaine, a first degree felony, in violation of R.C. 2923.03. Smith filed a motion to suppress, which the trial court denied after a hearing, challenging the validity of the traffic stop. Smith later filed a second motion to suppress his statements to law enforcement.

{¶4} At the hearing on the second motion, Trooper Benjamin Seabolt with the Ohio State Highway Patrol testified that on August 19, 2010, he initiated a traffic stop of a rental car for a following too close violation. A video recording of the stop showed it occurred at approximately 6:23 p.m. Smith was the driver and Christopher Carey was

the front passenger.  As Seabolt approached the vehicle, he smelled a "strong odor of burnt marihuana emitting from the vehicle."  He saw loose marihuana in the vehicle and on the t-shirts of Smith and Carey.  He *Mirandized* the men and began to question Smith.  Smith said he was coming from Dayton, Ohio and going to Charleston, West Virginia.  He told Seabolt he had been in Ohio for about a week clothes shopping, but Seabolt observed no clothing in the vehicle.  Then Smith told Seabolt he had only been in Ohio for a couple of days.  Initially, Smith said he stayed with friends and family in Dayton.  Later, he claimed he stayed with his girlfriend but did not know her name.  Smith also did not know Carey's real name – just his nickname.  Smith told the trooper that he and Carey had been together their whole time in Ohio.  The rental car agreement showed the car had been rented the day before; however, Smith's uncle was the only authorized driver.

{¶5}    The trooper asked Smith about drugs in the vehicle, and Smith admitted that he and Carey had been smoking marihuana.  After further questioning, Smith retrieved a baggie that contained approximately 10 grams of marihuana from his crotch area.  Seabolt acknowledged that possession of this amount would only constitute a minor misdemeanor.  He also admitted that the contents of the baggie were probably never tested, and he only identified it as marihuana based on his training and experience.  Seabolt testified that it is a common technique for people to have drop baggies, i.e., small baggies, of marihuana to give an officer to "appease the officer so that they can go on their way."  Seabolt performed a pat down search of Smith, which revealed no other contraband.  However, Seabolt testified that because Smith wore very tight jean shorts, he could not satisfactorily pat down the area in the back of his shorts.

Seabolt put Smith in the cruiser. He never gave Smith a citation for the marihuana or traffic violations. He also never conducted field sobriety tests or determined whether Smith violated a criminal statute by operating the rental vehicle without authorization.

{¶6} Next, Seabolt questioned Carey, who did not know where the pair was traveling from. He claimed they just left West Virginia at 11 a.m. that morning and had only been in Ohio a few hours. Carey also told Seabolt that he and Smith had been together their whole time in Ohio. Seabolt searched Carey and felt a long, hard object approximately five or six inches long lodged between Carey's buttocks. It was a "rock type hard object and had edges on it." Seabolt could not positively identify the object at that time because Carey was being uncooperative. He consistently pulled away from Seabolt and was "clinching his buttocks." He kept his feet close together "even after repeatedly being instructed to not do that and to move his feet apart." Seabolt testified that he believed the object was a large quantity of crack cocaine based on his training and experience. He later testified that he was also concerned the object might be a weapon. Seabolt handcuffed Carey and secured him in the patrol car while Seabolt and other troopers searched the vehicle. The troopers found "shake," i.e. loose marihuana, spread throughout the passenger compartment of the vehicle. Seabolt had the vehicle towed because Smith's uncle, the only authorized driver under the rental agreement, was not present.

{¶7} Seabolt transported Smith and Carey to a patrol post. They arrived at approximately 7:45 p.m., roughly one hour and twenty minutes after the initial stop. He wanted to "afford Mr. Carey the dignity of not having his clothing removed beside * * * the roadway * * *." Seabolt brought Smith to the post in part because Seabolt thought

he would have a complicity charge against Smith for whatever drugs he found on Carey. Seabolt testified that at the post, Smith was in investigative custody and was not free to call someone to get him.  Less than 10 minutes after their arrival at the post, Seabolt found approximately 70 grams of crack cocaine in between Carey's buttocks.  Seabolt searched Smith again, with Smith's outer shorts removed, and found nothing.  Seabolt testified that he believed this search occurred after the second search of Carey but before Seabolt questioned Smith again.  Seabolt told Smith about the drugs on Carey and said that Smith was going to be arrested for complicity.  Smith told Seabolt that he could provide the location the drugs came from and made other incriminating statements.  According to Seabolt, Smith made these statements approximately 15 minutes after arriving at the post.

{¶8}   The trial court denied the second motion to suppress.  Smith pleaded no contest to the charged offense, and the court found him guilty and sentenced him.  This appeal followed.

## II.  Assignment of Error

{¶9}   Smith assigns one error for our review:  "I. THE TRIAL COURT ERRED WHEN IT DENIED SMITH'S SECOND MOTION TO SUPPRESS."

## III.  Motion to Suppress

{¶10}  In his sole assignment of error, Smith contends that the trial court erred when it denied his second motion to suppress.  Our review of a trial court's decision on a motion to suppress presents a mixed question of law and fact.  *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8.  When considering a motion to suppress, the trial court acts as the trier of fact and is in the best position to resolve

factual questions and evaluate witness credibility. *Id.* Accordingly, we must accept the trial court's findings of fact if they are supported by competent, credible evidence. *Id.* Accepting those facts as true, we must "independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard." *Id.* at ¶ 8.

{¶11} The Fourth Amendment to the United States Constitution, as applied to the states through the Fourteenth Amendment, provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." Section 14, Article I of the Ohio Constitution also prohibits unreasonable searches and seizures. Because Section 14, Article I and the Fourth Amendment contain virtually identical language, the Supreme Court of Ohio has interpreted the two provisions as affording the same protection. *State v. Orr*, 91 Ohio St.3d 389, 391, 745 N.E.2d 1036 (2001).

{¶12} Searches and seizures conducted without a prior finding of probable cause by a judge or magistrate are per se unreasonable under the Fourth Amendment, subject to only a few specifically established and well-delineated exceptions. *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). Once the defendant demonstrates that he was subjected to a warrantless search or seizure, the burden shifts to the state to establish that the warrantless search or seizure was constitutionally permissible. *See Maumee v. Weisner*, 87 Ohio St.3d 295, 297, 720 N.E.2d 507 (1999). In this case, law enforcement did not obtain a warrant for any

purpose.

{¶13}  "An officer's temporary detention of an individual during a traffic stop constitutes a seizure of a person within the meaning of the Fourth Amendment * * *." *State v. Lewis*, 4th Dist. No. 08CA3226, 2008-Ohio-6691, ¶ 14.  A stop is constitutionally valid if the officer's decision to stop the motorist for a " 'criminal violation, including a traffic violation, is prompted by a reasonable and articulable suspicion considering all the circumstances * * *.' "  *State v. Kilbarger*, 4th Dist. No. 11CA23, 2012-Ohio-1521, ¶ 15, quoting *State v. Mays*, 119 Ohio St.3d 406, 2008-Ohio-4539, 894 N.E.2d 1204, ¶ 8.  However, "the officer must 'carefully tailor' the scope of the stop 'to its underlying justification,' and the stop must 'last no longer than is necessary to effectuate the purpose of the stop.' "  *State v. Marcinko*, 4th Dist. No. 06CA51, 2007-Ohio-1166, ¶ 26, quoting *Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983).

{¶14}  " 'An officer may lawfully expand the scope of the stop and may lawfully continue to detain the individual if the officer discovers further facts which give rise to a reasonable suspicion that additional criminal activity is afoot.' "  *Kilbarger* at ¶ 16, quoting *Marcinko* at ¶ 26.  "[T]he officer may detain the driver for as long as that new reasonable articulable suspicion continues."  *State v. Goggins*, 6th Dist. No. L-99-1218, 2000 WL 331434, *1 (Mar. 31, 2000).  "In deciding whether a reasonable suspicion exists, courts must examine the ' "totality of the circumstances" of each case to determine whether the detaining officer has a "particularized and objective basis" for suspecting legal wrongdoing.' "  *State v. Spindler*, 4th Dist. No. 01CA2624, 2002 WL 727839, *3 (Apr. 23, 2002), quoting *United States v. Arvizu*, 534 U.S. 266, 266, 122

S.Ct. 744, 151 L.Ed.2d 740 (2002).

{¶15} Smith does not challenge the constitutionality of the initial traffic stop. However, he contends that at the time the trooper questioned him about the crack cocaine found on Carey, his detention had become illegal. Smith suggests that after the trooper conducted two fruitless searches of him and found no contraband in the vehicle (aside from the "shake" in the passenger compartment), he should have been free to leave or call someone to pick him up. He argues that when the trooper questioned him about the crack cocaine, the trooper had no reasonable, articulable suspicion of any other criminal activity, i.e., Smith's complicity in Carey's possession of crack cocaine. And Smith claims that because he made statements about the crack cocaine during an unconstitutional seizure, those statements must be suppressed under the exclusionary rule.

{¶16} "The exclusionary rule operates to exclude evidence obtained by the government in violation of the United States Constitution." *State v. Helton*, 160 Ohio App.3d 291, 2005-Ohio-1789, 826 N.E.2d 925, ¶ 14 (11th Dist.). "The purpose of this rule is to deter police misconduct." *Id.* "The exclusionary rule reaches not only primary evidence obtained as a direct result of an illegal search or seizure, but also evidence that is subsequently discovered and derivative of that prior illegality." *State v. McLemore*, 197 Ohio App.3d 726, 2012-Ohio-521, 968 N.E.2d 612, ¶ 20 (2d Dist.).

{¶17} It is clear that during the initial detention, the trooper developed a reasonable, articulable suspicion that Smith was involved in criminal activity – personal possession of contraband. The trooper smelled burnt marihuana when he approached the vehicle and saw loose marihuana in the vehicle and on Smith's person. Then Smith

gave inconsistent stories about his travels and lodging.  Smith admitted to smoking

marihuana and gave the trooper a baggie of it, prompting the trooper to conduct two

searches of his person and a search of the vehicle.  But aside from some "shake" in the

vehicle, the trooper found nothing during these searches.

**{¶18}**  At the latest, after the second search of Smith the trooper's reasonable

and articulable suspicion that Smith personally possessed contraband dissipated.  The

trooper chose not to cite Smith for the traffic violation or minor misdemeanor marihuana

possession, so Smith's continued detention was not justified by the trooper's need to

write citations.  Thus, Smith's continued detention and questioning about the crack

cocaine was illegal unless the trooper had a reasonable articulable suspicion of Smith's

involvement in other criminal activity, i.e., his complicity in Carey's possession of crack

cocaine.

**{¶19}**  The parties do not dispute the facts.[1]  Instead, they dispute the import of

those facts, i.e., whether they satisfy the applicable legal standard.

**{¶20}**  Smith argues that it is not reasonable to assume a driver of a vehicle

knows his passenger has contraband hidden beneath his pants and between his

buttocks absent other evidence.  The State focuses its argument on the constitutionality

of the trooper's decision to transport Smith to the patrol post – not Smith's detention at

the time of his statements about the crack cocaine.  Thus some of the facts the State

highlights relate to Smith's personal possession of marihuana, not complicity in Carey's

possession of crack cocaine:  1.) the odor of marihuana in the vehicle, 2.) the

---

[1] Smith contends that his detention lasted over four hours.  While the traffic stop and continued detention at the patrol post lasted approximately four hours, based on the recordings of the stop and Seabolt's testimony, Smith made the incriminating statements he seeks to suppress approximately 95 minutes after the stop.

marihuana flakes on Smith and in the vehicle, 3.) Smith's admission to smoking marihuana, 4.) the baggie of marihuana Smith gave the trooper, and 5.) the fact that Smith's tight shorts hindered the trooper's initial pat down search.

**{¶21}** However, additional evidence suggests Smith was complicit in Carey's possession of crack cocaine. Smith and Carey were obviously willing to engage in illegal drug activity together as evidenced by Smith's admission that the pair had been smoking marihuana. The pair gave inconsistent stories about the length of their travels. However, Smith and Carey agreed that they were together their entire time in Ohio, so Smith would have been with Carey during any drug transactions Carey conducted in the state. In addition, Smith acted suspicious by operating a rental vehicle without authorization, giving inconsistent stories about his lodging, and saying he was clothes shopping in Ohio when there was no clothing in the vehicle.

**{¶22}** Moreover, Seabolt testified that it is a "common technique, a common trend for people to have drop Baggies of marihuana, meaning small Baggies of marihuana, that they'll give an officer trying to appease the officer so that they can go on their way." In other words, it is common for criminals to give a suspicious officer a token amount of marihuana in the hope that it will quell the officer's suspicions so he will not investigate further and find their larger stash of drugs. Thus, the fact that Smith gave Seabolt a small baggie of marihuana could have been a ploy to detract attention from the crack cocaine between Carey's buttocks.

**{¶23}** We find this to be sufficient evidence to support a conclusion that under the totality of the circumstances, the trooper had a particularized and objective basis to suspect Smith was complicit in Carey's possession of crack cocaine. Accordingly, we

overrule the sole assignment of error and affirm the trial court's judgment.

JUDGMENT AFFIRMED.

## JUDGMENT ENTRY

It is ordered that the JUDGMENT IS AFFIRMED and the Appellant shall pay the costs.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Ross County Common Pleas Court to carry this judgment into execution.

IF A STAY OF EXECUTION OF SENTENCE AND RELEASE UPON BAIL HAS BEEN PREVIOUSLY GRANTED BY THE TRIAL COURT OR THIS COURT, it is temporarily continued for a period not to exceed sixty days upon the bail previously posted. The purpose of a continued stay is to allow Appellant to file with the Supreme Court of Ohio an application for a stay during the pendency of proceedings in that court. If a stay is continued by this entry, it will terminate at the earlier of the expiration of the sixty day period, or the failure of the Appellant to file a notice of appeal with the Supreme Court of Ohio in the forty-five day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Supreme Court of Ohio. Additionally, if the Supreme Court of Ohio dismisses the appeal prior to expiration of sixty days, the stay will terminate as of the date of such dismissal.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure. Exceptions.

Abele, J. & Kline, J.: Concur in Judgment and Opinion.


For the Court


BY: _____
     William H. Harsha, Judge




## NOTICE TO COUNSEL

**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**